Case number 23-5142. Ipsen Biopharmaceuticals, Inc. appellant versus Xavier Becerra in his official capacity as Secretary of Health and Human Services et al. Ms. Stetson for the appellant, Ms. Mittal for the federal appellees, Mr. Burgess for the appellee in Virginia Pharmaceuticals, Inc. Good morning, Ms. Stetson. Good morning, your honors, and may it please the court. My name is Kate Stetson. I represent the appellant, Ipsen Biopharmaceuticals. Ipsen's product, Somatulene Depot, is a biological product. The active ingredient in Somatulene Depot, anuretide acetate, assembles into long, complex chains and structures. Those chains and structures are proteins, as FDA defines them, which means Somatulene Depot is a biological product. The district court concluded that FDA's definition of protein, however, unambiguously requires FDA to look not at the active ingredient as it exists in Ipsen's product, but at anuretide acetate, just the eight peptide amino acid chain by itself before the product is even created. But FDA doesn't regulate amino acid chains. It regulates drug products and biological products in both the statute and the regulation refer to biological products. The product is what's labeled, the product is what's marketed, and the product is what's used, as it was here, by a competitor as a reference product. I guess I'm not following why, where this is going with product or timing, and whether we look at, whatever time we look at, the active ingredient is, I'm not sure I'll pronounce it right, but lanreotide acetate, right? The active ingredient is lanreotide acetate. I think the question, Judge Katsas, is, I think everyone agrees and concedes that lanreotide acetate, when it is in Ipsen's product, assembles into these complex structures. So it's not a question, as we say in our brief, that often occurs when you're talking about the difference between an active ingredient and an active moiety, all the things that often come up. This is the question about what does the active ingredient, lanreotide acetate, look like in the finished drug product, not what does lanreotide acetate look like off by its own, on the shelf, before it's manufactured. What you're looking at when you're asking the question about what is a biological product is, what is the thing that is in this product? And the question about what is in the product seems like a different question from what the active ingredient is. It seems that both Ipsen and the FDA agree that we have to look at the active ingredient in the product. And normally we think of active ingredient as a thing that has the pharmacological effect on the body. And isn't that the lanreotide acetate itself, not the nanotubes? I mean, I don't see Ipsen anywhere make the argument that it's the nanotubes that have the pharmacological effect. No, Judge Rowell, I don't think we're arguing that the nanotubes themselves, you know, at least solely convey the pharmacological effect. I think they play an important role in how this drug is delivered. But I think FDA's focus on active ingredient and the definition of active ingredient and what it means to have pharmacological effect, of course, are getting one and two and three steps away from what the statute and the definition actually say. And when we're looking at the statute, when it talks about what is a biological product, a biological product is a protein. What is a protein? You look at the definition. A protein is a collection of amino acids with a specific defined sequence more than 40 in length and so on and so forth. The question about the active ingredient, I think, doesn't appear anywhere in the statute. So what FDA is doing is trying to draw your attention away from the word product and towards this entire other inquiry that isn't based in the text in front of you. I'm a little confused about why you and your brief don't say anything about the second sentence in the definition of active ingredient in the regulation that's at 21 CFR 314.3. So the first sentence reads active ingredient as any component that is intended to furnish pharmacological activity or direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or any function of the body of man or other animals. So that's the first sentence. And then the second sentence says the term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect. And that sounds like your argument, but that language isn't in your brief other than citing to it in the statutory and regulatory addendum. Right. So Judge Wilkins, I do agree with your reading of that second sentence. I think it's more useful for our argument for indigents or the governments. I think one reason why we weren't focusing on the definition of the active ingredient, because the definition of the active ingredient, as I was saying to Judge Rao, already begins to pull you away from the definition that matters here. But to the extent that you look at that definition and the definition expands in to include the active ingredient as it exists in that finished product that's intended to confer, you know, not just the activity but the function. I think that's an important part of the overall analysis. The other thing that I would add that's I think in a similar vein is if you look at the definition of biological product in the statute, which is 42 U.S.C. 262 I.1, the term biological product includes a number of things, serums, venoms, toxins, including proteins applicable to the prevention, treatment, or cure of a disease or condition of human beings. And I think to the extent, Judge Wilkins, that runs in parallel with the definition of active ingredient, then I think the two can be read somewhat consonantly in that way. But the intervener and FDA point out that if we were to adopt your position about what is biological product, then one formulation of this octopeptide would not be a biological product. It would be a drug product while the Somatulin depot formulation would be a biological product because the drug is also administered instead of this extended release version but as a, I guess, immediate release version where you don't have the nanotubes. And so, let's say you do that problem. I think that is a feature of the way that FDA has decided to regulate. So, if you read FDA's memorandum that supports its definition of protein, all of the different options they considered, if you read its proposed rule and its final rule, one of the things that FDA says repeatedly is we understand that by creating these bright line rules, we're going to be walling things in and walling things out. And that there are things on either side of those walls that someone else could argue, you know, arguably are proteins. So, just because there is a different formulation of an active ingredient in a product that doesn't have, that doesn't satisfy that definition of protein, that's, I think, a feature of the definition. And to the extent that that becomes an actual problem rather than some theoretical problem, I think Congress and FDA have the ability to change the definition as it currently exists. What exists right now is a product that contains a protein. And the protein, of course, is a biological product. So, if you, your client, Ibsen, also markets and sells this in a formulation that's not the Cemention Depot, the extended release, with the same octapeptide, right? I believe that's correct. I don't know the extent to which, you know, how much is sold, or so forth, and I don't even know. The big seller, obviously, is the Cemention Depot product. Correct. But the point remains that you would have one formulation be a biological product and one extended release. That's correct. But I think, as I mentioned, the answer is… And they both do the same thing, right? They do not do the same thing. And to the extent that we start looking at the question of what they do, I think we're, again, not looking at the definition. One of the things that FDA said in its memorandum and in its proposed and final rule is we're actually not going to look at function. We are going to create, to the extent we can, a bright-line rule so that we don't have to have extended debates about what falls in and outside that rule. So, if we were looking at function, maybe then we could have a debate about whether the thing that extended release Cemention Depot does is different than the other form of laminated acetate. But by creating this definition as it did, intentionally to create these kinds of concrete rules of application, FDA was necessarily making some judgments about how to go about assessing things. And one of the things that… Even with a bright line, though, don't we still have to look at what the active ingredient is in the drug? Yes, you have to look at what the active ingredient is in the drug. That's exactly right. You don't look at the active ingredient as it exists in some kind of theoretical octopeptide form. You look at what it is doing in the product. And what it's doing in this product, I think everyone would agree, is assembling into these nanotubes meet the definition of active ingredient in the regulation? I know you say that's moving away from the statute itself, but I think in your briefing you can see that it has to be the active ingredient. You said it just now has to be the active ingredient. So, how do the nanotubes meet this definition? Well, I think the nanotubes meet the definition… What meets the definition of active ingredient is the lanreotide acetate. The active ingredient in the drug product, which is where your question started also, Judge Rao, is lanreotide acetate nanotubes. And I think keying off of Judge Wilkins' earlier point about that second sentence in the active ingredient definition, to the extent we need to smooth over what active ingredient means alongside what the definition of protein and the definition of biological product means, that's probably the hook to do it. But the important thing for asking this question, which is, is this a biological product, is that you're not asking, is lanreotide acetate a biological product? You're asking, is somatolene dipo a biological product? And I think the question is, what is this product and what does it consist of? It consists of an active ingredient that has formed, self-assembled into nanotubes. Now, one of the things that FDA says, of course, is even if you take the active ingredient as it exists in the product, it still doesn't meet the definition of protein, because according to FDA, the way that these nanotubes assemble doesn't typically occur in nature. Let's stick with that ingredient for a while, because that's where I am as well. Is it fair to say, my understanding, my limited understanding of the chemistry here is that the active ingredient is just being dissolved in acidic water, correct? It's being dissolved in water at room temperature, yes. So, I mean, there's no, the relevant chemical or molecule is still lanreotide acetate. And whatever's happening in water, I don't know, maybe the chemicals are aligning and aligning in a certain way because of the electric charge of water or whatever. I don't know what's going on there, but it's still the same molecule, just as we would say, water is H2O. H2O is H2O, even when it assembles in these huge ice crystals. I think the difference, two points, Judge Katsas. The first is the definition of protein, I think, by, even in itself, contemplates that you're going to be looking at this question at some particular point in time. Because remember that second part of the definition, one we're not talking about yet, talks about assembling in a manner that occurs in nature. So you're already making an assumption about when these proteins assemble together. And to your first part of your question, the definition of protein, the definition of biological product, the definition of active ingredient, none of those things ask the question, what is this molecule? And does this molecule standing alone do something? Even going back to the definition of biological product, it should ground the discussion. The definition of biological product is among other things, a protein or analogous product, which we should talk about, applicable to the prevention, cure or treatment of disease in human beings. The molecule of lanreotide acetate, you don't apply to a prevention, treatment or cure. You apply somatolene depot. You apply insulin. Insulin itself consists of two peptides that don't themselves qualify as a protein, but insulin is a protein. If you were to take insulin apart and look at those two separate molecules, they wouldn't qualify as a protein. But when you put them together, insulin becomes a protein. I think it's exactly the same analysis. That has some force to it, but it just sounds like you're trying to unravel what I thought was a fairly clear acknowledgement in your briefs that what we're talking about is the active ingredient. I embrace that idea. I think the question is what we're talking about is the active ingredient in the drug product. The active ingredient sort of off on its own, just the octopeptide is not what the statute or the regulations tell you to look at. The regulation itself wouldn't have to say you can count these separate structures towards the 40 amino acid count if you're just looking at those structures as they exist before anything happens to them, before the product is created, before somatolene depot is manufactured. I know my time is up. If I can just maybe take a step back. When we talk about a drug product, we're talking about the active ingredient plus the substance or the form it takes and how it's administered. Should we understand biological product in the same way? It's an active ingredient plus the form in which it's administered. It seems like the nanotubes are the form in which it's administered. It's what make up the product as it's used by a patient, but that doesn't mean that that is the nanotubes or the active ingredient. It seems to me the protein is more analogous to the drug substance or the active ingredient. You seem to be saying the biological product is just the somatolene depot as it's administered. That seems like it would separate the definition of what a biological product is from what we think of as a drug product. It seems the more natural reading is to think of those two things in a similar way. I do agree that we should think of those two things in a similar way. One of the arguments that I hear FDA and Indigen making in it's wrong to look at the definition of drug product because there's no similar definition of biological product. The definition of drug product under the regulations is the product in its finished dosage form. Keying off of your question, I think then it makes only logical sense for a biological product also to be the finished dosage form. The finished dosage form, but the active ingredient is not the finished dosage form. It's the thing that actually has the pharmacological effect. The active ingredient in the finished dosage form. I think that's the difference. What FDA and Indigen are trying to do is to just strip out this idea of the active ingredient, separate it completely from the rest of the product, and just look at this molecule by itself and ask the question, what does this molecule do and how long is it? But we already know that FDA already has defined something to be an addition of molecules in certain circumstances. We know that this definition that we're looking at asks the question about what is a biological product. We know that the active ingredient that matters is the active ingredient as it exists in the product because to your earlier point, that's what's doing the work. What's doing the work in a finished product is the active ingredient as it exists in that finished product. What is doing the work? The nanotubes aren't doing the work. The lanreotide acetate is doing the work. I don't see you making an argument that the nanotubes themselves are doing the work. The nanotubes are just a way to slowly administer the lanreotide acetate, right? When I say doing the work, I think I'm using it as a rather a shorthand. A shorthand. It's not the pharmacological effect. There's a reason I'm not saying pharmacological effect because that gets us several steps removed from the definitions that we're actually concerned about. When I say doing the work, it means applicable to the prevention or cure of illness disease under the definition of biological product. The thing that is doing the work is the product itself, including the active ingredient as it exists in the product, not just some random octopeptide. That's not what's being regulated. It's not what's being used as the reference product. The reference product is somatolene depot. You don't think FDA could reasonably distinguish between doing the work in the stricter sense that Judge Rao might have been getting, a pharmacological effect affecting the structure and function of the body of man or whatever it is within the human body on the one hand, and doing the work in the sense of a dosage release mechanism. I think, again, maybe the way to marry up those two things is to look at that second definition sentence that Judge Wilkins pointed out. To the extent that we're going to talk about a biological product as... The second sentence presupposes a chemical change. It just goes back to the lamreotide acetate. The second sentence presupposes a chemical or structural change. What we're talking about here is the structure of lamreotide acetate as it exists in the finished dosage product. The term includes components that may undergo chemical change in the manufacture of the drug product. When we talk about a chemical change, the chemical change that occurs is the... Let me actually take one step back, because I think the more that we talk about chemical changes and molecules and so forth... Molecule dissolving in water at room temperature. Maybe I'm misremembering my chemistry. I don't think that's a chemical change. It's the same molecule. Molecules associating lengths of amino acids associating with each other, forming complex structures, I think easily qualify as a chemical change. But again, even reading this definition of this word that doesn't appear in either the statute or regulation that we're talking about gets you further and further away from the text. What the text says is, ask the question, is this a biological product or an analogous product applicable to the prevention or cure of a disease or illness? If this is a protein, it is a biological product. You don't just ask the question, is this octopeptide floating around in the wild a biological product? You ask the question whether somatulene depot is a biological product. I think all of the work that... But you also agree that it's the active ingredient in the somatulene depot. I do. That is the protein. I do. But you haven't explained how the nanotube is the active ingredient. When we ask you that question, you say, well, active ingredient is too far from the statutory definition. Judge Rao, I think maybe the difference that you and I are having is just where the emphasis is being put. You're emphasizing active ingredient in the drug product. I'm emphasizing active ingredient in the drug product. The active ingredient, lanreotide acetate, forms nanotubes. The nanotubes are part of the lanreotide acetate structure. I'm not looking at the nanotubes as some separate entity. They are nanotubes of lanreotide acetate. That's the active ingredient in the finished drug product. I think that's how to tie the two together. If I could take a couple of minutes and just touch on the two other issues that I think are particularly important here. One of them is this question about associating in a manner that occurs in nature. This is a quintessential rewriting of an agency regulation. What the agency regulation says is when two or more chains associate with each other or are associated with each other in a manner that occurs in nature, you count them together for purposes of counting the size of that polymer. What FDA said below, and what it says again in these amino acid chains, these nanotubes of lanreotide acetate are not associated with each other in a manner that typically occurs in nature. We agree that this happens in nature. It just doesn't typically happen. But that is just flat out redlining of the regulation. So that's, I think, my short argument on the second point. The third point is even if you take FDA at its word that the thing that you look at is lanreotide acetate in the wild, even if you agree that these don't typically occur in nature, you're left with this question about whether this is an analogous product. And what FDA has argued before, and this is a Teva case, is that the critical element of a protein, the touchstone, and that's at the Teva case, pin site 113 and 115, the critical element of a protein is a specific defined sequence of amino acids. But now, of course, what FDA is saying is there's actually one more critical touchstone, and that is it absolutely has to be more than 40 amino acids long, and it has to be typically occurring in nature. But with those touchstones, anything else can be a protein. Once you establish that the thing that is analogous to a protein has to actually be a protein, you're no longer reading anything into the words analogous product. So I think even if you disagree with us on our first two points, the FDA's reading of analogous product is simply not consonant with the way that that regulation must be read in order to have any substance to it. What about their example of the mixture? I think under the... Proteins and other non-amino acid molecules dissolve together. They both have pharmacological effect to mixture-containing proteins, which provides a vehicle for treating the non-amino acid component as a protein, as well as the protein component. I think under FDA's definition of protein, a mixture containing a protein is a protein. And I think that's the problem with FDA's sole example of the thing that it considers to be analogous to a protein is a thing containing a protein. That just doesn't work. If there is a non-amino acid component to a protein, it's a non-amino acid component to a protein. Thank you. Good morning, Ms. McPowell. Morning. May it please the court, Urja Mithal for the government. As you just heard, Ipsen agrees that the active ingredient is a proper frame of analysis for deciding whether its product is a protein. And Ipsen also agrees that the active ingredient and its product is made up of eight amino acids. That's enough to decide this case and conclude that Ipsen's product is not a protein. The active ingredient in Ipsen's product is made up of one eight-amino acid chain. It's that eight-amino acid chain that has the specific therapeutic effect that Ipsen identifies on its product labeling. It's that eight-amino acid chain that binds to the somatostatin receptors in the body and mimics the function of natural somatostatin in the body. It is not the nanotubes that have that pharmacological effect. Those nanotubes are not the active ingredient that Ipsen recognizes. The associations between the amino acid chains and the nanotubes are associations between copies of the active ingredient. And again, Ipsen has told you the active ingredient is the proper frame of analysis for deciding whether a product is a protein. Can I interrupt you for a sec? The regulatory definition of active ingredient says that it's any component that is intended to furnish pharmacological activity or other direct effect. So, the regulation itself doesn't restrict active ingredient to furnishing pharmacological effect. It says other direct effect. So, why can't direct effect be putting the ingredient in a formulation that gives it an extended release so that it can operate over time and the person not have to get an injection, you know, every day? Your Honor, there may be products that have active ingredients that are defined that way, but the product before the corte simatulangico, the active ingredient there is langretide acetate. Ipsen told FDA that in its new drug application, it told FDA that in its product labeling, you look at JA305, JA309. On those, in that product labeling, Ipsen says the active ingredient is langretide acetate, a synthetic octopeptide. There's no mention. Is there authority that says that they're bound by that? I mean, my understanding of this is that was in the context of getting a new drug application approved. It goes in the orange book, right? That's right. And this is a whole different process for biological product that goes in the purple book. It's a whole different kind of regulatory scheme. So, what authority, what statute or regulation or case says that, like, once you say the context of trying to get approval under one provision, you are bound by kind of that description? It's not a question of an authority binding. Ipsen, it's a question of, as you said, Your Honor, defining what the active ingredient is and figuring out what role the nanotubes have to play in this analysis. And FDA explained that in its view, in its scientific judgment, the nanotubes are better considered to be the formulation property or the dosage form. So, if you look at 314.3 in subsection B, there's also a definition of dosage form. And again, Ipsen identifies this as part of the dosage form, hence the emphasis on finished dosage product, finished dosage form, excuse me. And one of the elements of what a dosage form is, is a design feature that affects frequency of dosing. And that is what FDA characterizes and understands the nanotubes to be. They are a self-assembly of lanretide acetate molecules that affect the frequency of dosing. They're no different from sort of a tablet capsule or solution. They're a different form, but they're nonetheless a formulation property. And Ipsen, in its reply, doesn't contest that. So, it seems to settle the ground that the nanotubes are better understood to be the dosage form of the product, not the active ingredient. So, we will... So, explain to me what the second sentence of the active ingredient regulation, what that means. So, the active ingredient, the second sentence, Your Honor, as Judge Taxis says, first, there's the question of whether the lanretide acetate molecule, when it self-assembles into a nanotube, can properly be understood to be undergoing a chemical change. That's something FDA hasn't taken a position on, nor has Ipsen argued that that's considered a chemical change. But an easier way to resolve the application of this sentence of the definition of active ingredient here is the part that says, it's in a modified form intended to furnish the specified activity or effect. Nowhere has Ipsen said, nor has the FDA concluded, that the nanotube is a form intended to furnish the specified activity or effect. The specified activity throughout the new drug application, throughout the product labeling, throughout the briefing in district court, throughout the briefing in this court, is for the lanretide acetate octopeptide to bind to the somatostatin receptors in the human cells. That's what affects the human production of human growth hormone. That's the intended pharmacological effect of lanretide acetate. And at JA, I believe it's 480, FDA explains that it's not the nanotubes that have that biological effect. As your honor said earlier, the nanotubes affect the frequency of dosing. The pharmacological effect that Ipsen sought approval for was binding to those somatostatin receptors. And so even if we can look at the nanotubes as a modified form of lanretide acetate under the second sentence, which again FDA hasn't taken a position on, they wouldn't be intended to furnish the specified activity or effect because that effect is the binding. And the binding occurs at that eight amino acid level, at that octopeptide level. It's not a hypothetical form because that eight amino acid octopeptide is what separates from the nanotube and then binds to the receptors. It's not the nanotubes that do that. What does analogous product mean? So FDA has explained that for purposes of this case, all that this court has to think about is that it doesn't include those products that are specifically excluded from the definition of protein. And so a product with definition of protein set forth in FDA regulation is an alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size. This falls outside of that definition expressly and therefore isn't analogous. I don't think I've ever understood anyone to ever contend that in order for something to be analogous, it has to have all of the properties of the thing that you're contending that it's analogous to. It just doesn't make sense. That's right, your honor. So the naturally derived mixtures are a good example of this. And contrary to sort of what Ibsen was describing, naturally derived mixture of the kind described in FDA's decision to Ibsen, which contains a protein component as well as a non-biological product component, that kind of a product is not a protein. It doesn't fit within the definition of a protein because it has this significant non-biological product component. And a protein is only present in that product in a smaller unknown quantity. But why does something not become a protein only because it's not 100% protein? Well, that might not be the only context in which something might not be a protein and FDA decides whether something is analogous on a case-by-case basis. But here's what I don't understand. If you have, let's say, alcohol that's dissolved in water and maybe or other liquid in whether it's beer, wine, or vodka, or whatever, you don't say that that mixture doesn't have alcohol in it because it's in a low concentrate or because it's mixed with one thing rather than another thing. It's still got alcohol in it. So I'm not sure how the mixture example really does anything to move the needle as far as giving analogous meaning. So I think our intuition, FDA's intuition, aligns exactly with yours, Your Honor. In the alcohol context, there is alcohol in that mixture that you described, if I understood your hypothetical correctly. And in the naturally derived mixture of the kind FDA described in its decision, there is a protein component. And that protein component meets the definition of a protein in the regulation defining a protein at 21 CFR 600.3. It is an alpha amino acid polymer with a specific defined sequence, but the overall mixture is not a protein. And the active ingredient in that kind of mixture is the whole thing. It's the whole mixture. But FDA says, nevertheless, that's analogous. And I think going back to Your Honor's original question, how do we think about what are the bounds of an analogous product or when does that analysis apply? One way of thinking about the naturally derived mixtures is to say, well, those are mixtures. That's a kind of product that's not addressed by the definition of a regulation. That category is there for FDA to think about products that aren't addressed by the regulation. Regulation talks about alpha amino acid polymers with a specific defined sequence. It doesn't begin to help the FDA understand how to get analyzed under the naturally derived analogous product provision of the statute. Instead, it's not a protein, but then deemed analogous to a protein. It's not specifically excluded from the definition of a protein the way an eight amino acid chain like Ipsin's product is. FDA drew a numerical bright line threshold and this falls outside that both protein and the other item that it's mixed with have pharmacological effects. So that way, yes, Your Honor, the way the FDA thinks that describes the kind of mixture that would be analogous to a protein is that it has a protein component, a non-biological product component. And then the protein component must be necessary for the functioning of the product and it has to specifically contribute to the product's intended therapeutic effects. So the it's just not the only element of the product. I mean, just to follow up on Judge Wilkin's point, I mean, isn't that just saying that something that is part of protein is a protein? So I mean, that the analogous isn't doing any work? I mean, if it's just a protein in it, you know, it's a mixture that includes a protein. It's not quite the same, Your Honor, because it doesn't meet the definition of a protein. So it is classified as a product that's analogous to a protein. It's nonetheless regulated as a biologic, but it is not quite the same because it has a significant other component. So the analogous product category captures that in FDA's view. And they're just, I mean, FDA has classified three products or transitioned three products to being regulated as a biologic. It's not an empty set, these mutually derived mixtures, nor is the analogous product set an empty set for that very reason, but it doesn't quite fit in the definition of protein. The fact that it sounds analogous to a protein is exactly why it fits within the definition of an analogous product. That's sort of the very nature of that, that it feels so similar to a protein, but it's not specifically excluded by the definition of protein. And that's why that kind of a mixture, it's not a perfect comparison to Ibsen's product here, is classified as analogous, whereas Ibsen's isn't. Ibsen's is an eight amino acid chain, and that's far from the 40 amino acid line that FDA drew in its regulation before, that's before the court and not challenged here. Sort of counterintuitive notion of analogous. Now here, analogous to a protein, I think a molecule, a chemical, an active ingredient that is almost a protein, but not quite. And the only example you've come up with is something where you have one active ingredient that is a protein, another one that is nothing close to a protein, and the analogous provision is just giving you a hook for treating the wholly non-protein ingredient as a protein. It hangs together, it's just an odd usage of analogous. So two points, Ron, on the naturally derived mixture, the way FDA looks at those products, and there exists, as I said, certain products, the whole mixture is the active ingredient. You wouldn't quite say the protein component alone is an active ingredient, so it's the protein and, for instance, a lipid component. And in that, in the case of the actual products before the FDA, there's also a peptide component that's serous. Oh, so because the protein itself in the bipo can't affect the bodily structure? Because the protein component alone wouldn't achieve the entire intended therapeutic effect. I got it, okay. And so on your honor's first point about sort of how we understand the definition of the term analogous, of course, FDA hasn't promulgated its definition. It's left that category somewhat undefined for purposes of regulating products that haven't yet come before the agency and for allowing for scientific advancement. But FDA doesn't understand that to mean products that are quite close to being a protein, but not quite. And that would defeat the purpose of that right-line rule that FDA drew, and it would allow the term analogous product in the statute to wipe out or render meaningless the term protein, because everything that doesn't fit within the definition of protein could then be regulated as analogous. But FDA drew a clear line in a regulation that's not challenged here, that complex products that are greater than 40 amino acids in length and that meet the other properties of being a protein are going to be what count as proteins. And there was good reason for that. There isn't a single characteristic that unites all of the categories of biological products in the statute at 42 U.S.C. 262, but one of the common features of biologic products is that they're all fairly complex. And FDA in deciding how to define a protein in the unchallenged regulation here said, well, look, we've had peptides that are fewer than 40 amino acids in length. They're not quite complex. We have to draw a line for regulatory certainty. And we've regulated peptides as drugs so far. We've approved generic drug applications for peptides for their abbreviated NDAs for those. But proteins are complex and of a nature sort of... What you're doing makes a good bit of sense. I just wonder if it's consistent with statutory scheme, which says one category of thing is protein, and then the regulatory treatment extends to a broader category of thing, which is anything analogous to a protein. And your reasoning comes back to where Judge Wilkins started us, which is there's a very somewhat complex and very precise definition of protein. And the agency's reasoning is whatever falls outside those lines, not only is it not a protein, it can't be analogous to a protein because otherwise you're undoing the deliberately precise line that FDA drew. And putting aside mixture just as a matter of abstract reasoning, that seems to write analogous out of the statute. So, Your Honor, we would disagree that it's writing analogous out of the statute because there are... You can think of them as two separate categories. There are things... Or maybe three. There are products that are proteins and they meet the definition of protein. They don't have other components. There are products that are specifically excluded by that carefully drawn regulation, that the carefully drawn regulation specifically says cannot be proteins. And then there are products that aren't captured by that regulation. The regulation doesn't tell us what to do with that kind of a product. And so the mixture is all in that third category. And now this product has, at least as to a protein, has been understood to include those kinds of mixtures. On the mixture, why is the definition silent as opposed to specifically excluded? Because you have these non-amino acid molecules that are essential to the pharmacological effect. You told me earlier that we have to think of the non-amino acid component as part of the active ingredient, and that would seem to make it not a protein. So the way FDA thinks about it is that it's not addressed because it contains an alpha amino acid polymer that otherwise meets the requirements, but does also contain this other product. So sort of from a practical perspective, that's not quite the same as failing to meet the defined characteristic of a protein as set forth in the regulation. That seems to be more specifically excluded. You could, Your Honor, say that the mixtures are also excluded in some sense. There's some difference between the nature and extent to which it's excluded. Okay. Thank you. Has the FDA approved anything as a mixture or anything as analogous to a protein? Yes. So as I mentioned, Your Honor, there are three products that FDA has evaluated and considered within the definition of a naturally derived mixture with a protein component and a non-biological component. One of them is a product called Infaserf. The active ingredient there is calfactant. It's a product for respiratory distress in newborns. And in that product, there's a protein called surfactant B. It's a surfactant protein, and that protein is an alpha amino acid polymer with a specific defined sequence that's 79 amino acids. That product also has a peptide, something that's fewer than 40, and then that has a non-biological component in that. All of those components work together. They're all part of the active ingredient. Any of them alone couldn't have the specific therapeutic effect, but the protein component is necessary to the product's functioning and specifically contributes to that therapeutic effect. Can I just clarify something on what you were saying about dosage form? So, in either the new drug application process, orange book process, or this biological product process, the purple book process, is that the FDA will, might approve one dosage form, but that doesn't necessarily mean that it approves all dosage forms of that active ingredient, right? That's right, your honor. So, the FDA might approve extended-release capsules, but not chewable tablets. You know, that doesn't mean that if a company has approval to market extended-release capsules containing the active ingredient, that company would be violating the Food, Drug, and Cosmetics Act if they, without getting separate FDA approval, just started marketing chewable tablets with that active ingredient, right? That's right. So, in that sense, the FDA looks at the finished product as the drug product because, you know, approval for one doesn't mean that it's going to be safe in another form, right? For approval purposes, it looks at formula, FDA looks at formulations and dosage forms. It looks at a host of factors. It looks at manufacturing. It looks at the purity or safety or effectiveness, depending on the kind of product. Exactly. And so, when we're talking about biological products, doesn't it work the same? I mean, if the sematuline product that's ingested and the person has to get the daily ingestion, you know, by a doctor or at a hospital, and that gets approved, that doesn't mean that Ipsen can then just come up with this extended-release formulation and start marketing that without getting a separate approval, right? That's right, Your Honor. For approval, the formulation property matters, but for classification, that's not something the FDA has ever classified or drug or biologic based on formulation property or the concentration. This is at link JA-474. FDA doesn't look at dosage form there, and there's another product that's described in FDA decision letter to Ipsen named octreotide acetate. It's an octapeptide, also mimics the function of somatostatin. That's approved for immediate and extended release. Both are approved as drugs, and for good reason. If you take a sort of more accessible example, you know, it's not a protein, but if you think about ibuprofen, sort of everyday drug, it's regulated as ibuprofen. It's classified as a drug, whether it's an immediate release or extended-release form. And so, too, when we're thinking about classifying a product like sematuline depot, for approval purposes, FDA looks at a host of factors, but those aren't all the same factors that FDA looks at for classification. For classification... So help me understand, then, what does 262-J mean? Because the language in 262-J that the Food, Drug, and Cosmetic Acts, including certain requirements, applies to a biological product subject to regulation under this section, except that a product for which a license has been approved under subsection A shall not be required to have an approved application under section 505 of the Food, Drug, and Cosmetic. So there, this statute about kind of how we're regulating biological products, it hearkens back to, well, you don't have to have approval under the Food, Drug, and Cosmetic Act. I mean, that's actually the whole point of this statute, right, is that this is a separate way to get approval. But you're saying that the final formulation is relevant to approval, but it's not relevant to classification, and that's why we don't care about final formulation or dosage form when we're trying to define biological product. But doesn't this statute here, subsection J, isn't it talking about approved applications? I mean, how am I to reconcile what you've been telling me? So that statute does say what your honor said, and it sort of points to the fact that even biologic products are subject to certain requirements under the Food, Drug, and Cosmetic Act. Biologic products aren't, depending on the kind of product at issue, some of the requirements that the FDCA will also apply, because significant purpose and a primary purpose, one might even say the biologic statute, is to create this different approval pathway for products that are classified biologics. But I think the key inquiry here is not what is the entire regulatory regime that applies to this kind of a product, but is this the kind of product that's subject to the different approval pathways for biologics? And so that question turns us on to 62I1, which I admit, your honor, it's not particularly available. It just lists the kinds of products that are gave it content in the regulation, and that's the regulation that sort of focuses our analysis here. And that regulation doesn't say to look at the finished dosage form. Neither does the statute, your honor. The statute says, defines a biological product. Nor does it say, look at the finished dosage form. And there are practical- My point is that this language in subsection J, 262J, talks about, you know, we are exempting products that has a license that's been approved as a biological product, and then says shall not be required to have an approved application under section 505 of the Food, Drug, and Cosmetic Act. And I guess what I'm trying to get at is to the extent that this is a fight about whether, in this case, turns on whether we're looking at the active ingredient as far as the octopeptide versus the active ingredient in the viscous gel nanotubes, if in order to get the application approved under the Food, Drug, and Cosmetic Act, they really evaluated the gel, the extended-release gel, because that's what you do when you get those applications approved. It's approved for a particular formulation. Is that being incorporated here by this language in subsection J, section 262? So, I think the direct answer to your question, your honor, is no. Subsection J isn't speaking to classification. It's true that a product for which there's an approved application under the biologic statute doesn't require an approved application under the Food, Drug, and Cosmetic Act, but that requirement doesn't then lead to the conclusion that all of the features outlined in the biologics application or in any drug application are relevant for classification purposes. The question of whether something is a protein doesn't turn on what its dosage form is. A protein is a protein whether you look at it in a tablet form, gel form, capsule form. It's important here to note, this would be a harder question if Ipsen had in its release or in its product labeling or in its new drug application, frankly, had ever said the nanotube is the active ingredient, but it didn't. At every stage, Ipsen said the active ingredient is just that octopeptide. So, this isn't a case where you have to think about the nanotube as the relevant ingredient. The nanotube is, for purposes of this case, no different from other dosage forms, the tablet, the pill, the gel, the injection, and a syringe. And so, even though that particular subsection of 262 cross-references the Food, Drug, and Cosmetic Act, that doesn't tell us how to think about the question for classification purposes, we look at the active ingredient because that's the only logical thing to look at. To conclude otherwise would be to say Congress intended in writing 262I1 and defining the different categories of things that are biologics, intended FDA, for FDA to look at the formulation property or dosage form, which FDA has never done. All of the products that were transitioned pursuant to the transition statute as proteins to biologics regulation, FDA looked only at the active ingredient. And that's why Ipsen conceded from the very start of its brief on pages 11, 20, and 30 of its brief, in its reply, it quotes FDA's brief and says, look, proper unit of analysis is the active ingredient. And so, it would... You didn't finish the sentence in their brief. They said active ingredient in its final formulation. That's what they said in their brief. That's the gist of their... You cut off the rest of the sentence, and that's the whole thing that we've been debating about here for the last hour. In certain sections, they've said that that's true, that they should look at the active ingredient in the finished dosage form. And FDA says that active ingredient in the finished dosage form is still the lanreutine acetate. No one has ever said the active ingredient is an octopeptide somewhere outside the body and then nanotubes inside the body. Even inside the body, the active ingredient is still the octopeptide. And we know that because Ipsen explains in its drug approval application, in its labeling, that the unit that binds to the receptors that has the specific pharmacological effect of treating the indications for which this product is approved, with carcinoid syndrome, acromegaly, is that octopeptide. And so, the nanotubes from that, you can infer, you don't have to infer, it's very clear from everybody's papers, are controlling the frequency of dosing. They're part of the dosage form, part of the analysis. And I think your honor trained in very early on 314.3b as a helpful regulation for defining these different components of the product. And it's clear if you look at those different definitions and that regulation, how to look at these different parts of the product or these different stages, however you might characterize them. Just so that I'm clear, when you use the term classification, you're using it to mean whether it's classified at a high level as a drug product versus as a biologic product. Is that how you're using it? That's right, your honor. Whether it's regulated for approval purposes as a biologic or drug, as your honor described earlier. Any other questions? All right. Thank you. Thank you. We'd urge the court to affirm. All right. Mr. Burgess. Thank you, your honor. Brian Burgess for Imogen Pharmaceuticals. I'd like to address your honor Judge Wilkins' questions regarding the regulation for what is an active ingredient that I'd like to touch briefly on analogous product, or maybe say a word to conclude about remedy and should the court find a need to reach it. So on the regulation for an active ingredient you asked about or other direct effect, whether that could encompass the dosage form, whether something is an extended release. And as government counsel indicated, the regulation specifically distinguishes the active ingredient, the drug substance from the drug product from the dosage form. So it's well-established FDA practice that the properties of a dosage form determining whether it's an immediate release or an extended release, those are pharmacokinetic properties, but they're distinct from what's actually having the pharmacological effect. That's not what is determining what the active ingredient is. And I think it would work a pretty dramatic revolution in FDA practice that that kind of dosage form, that dosage property were considered to be part of the active ingredient. One thing that I think is worth noting, part of this statute... What would be a direct effect that's not a pharmacological effect? What would be an other direct effect? I don't know the full scope of what the agency is determined to be. I do know that it is excluded pharmacokinetic effects that just determine the release rate of the product and how it operates. And so whatever it is, it's not the... It's not this, it's not this. Yeah, that would... I'm sure the FDA has used that term in other places as kind of a catch-all, but it's clearly excluded these kind of release properties and what the rate of release of a drug product is. One thing the statute did, the transition statute, the BPTIA, was about creating a new abbreviated pathway for biosimilars as compared to because it had found that these more complicated protein of the products, if the ordinary generic show the same active ingredient pathway wasn't working, so they developed a new pathway. It would be a really odd result if as a result of the statute and the agency's implementation of it, you would have some products that have the same active ingredient being subject to the biosimilar pathway versus the ANDA pathway just based on concentration or other formulation properties. That would be a really odd result. I mean, these are the same. It's the same ingredient either way. And yet if you're having formulation properties make the difference, you have a totally different review standard that the agency applies. You have different reviewers engaged in this process. But in my past life, I used to litigate ANDA cases. And you would have people who would get patents for a different formulation of an active drug, something that could be ingested in a capsule instead of ingested intravenously. In the FDA, you'd have to get a different new drug application for that different formulation, the capsule formulation, than the liquid or ingestible formulation. So, I mean, doesn't it happen all the time that the FDA, even if they're, I understand it's all the same classification as a drug product, but that they look at different formulations and it has to go through a whole separate application process depending on the formulation? You would need to get a new approval. You can buy a supplement. You can rely on the previous approval. And of course, the whole point of it's in suit here is because they don't want us to be able to rely on the prior approval of this active ingredient as being safe and effective. They argue we need to go through a whole other regime and meet the different standards. That's like what the suit is about, why they are trying. I want you to have to do all of that because that'll take you years. Right. And they didn't. Them years of exclusive. Right. And they didn't do it, by the way. They were, of course, under the drug approval regime. And then now they're trying to transition by taking advantage of the transition statute to block a safe and effective product. But yes, your honor's right. I mean, certainly you have to get new approval for a different dosage form, but it's based on the same active ingredient. There's often an abbreviated process. You could use a 505B2 process, or if it's your own application supplement, which has abbreviated review because you're relying on the agency's previous determination that the active ingredient is safe and effective for its intended use. And there are the Sandoz case that Judge Rao issued the decision on about a year ago. It's focused on the fact that the active ingredient, for example, is what you determine whether you get into chemical entity exclusivity. So it's baked into the approval process that it's focused on the active ingredient. Yes, you get the overall drug product approved, but Ibsen has not disputed that what we are ultimately looking to is the active ingredient in this product is something they described on their label repeatedly as being the octopeptide, because eight is less than 40. I really think that ought to decide this case. And I do want to push back on the suggestion that it's a new inquiry because we're dealing with the biological product pathway and the purple book versus drug approval. Ibsen is relying on regulations and cases from the drug approval context. They said it's the same. You look at the question of whether it is an active ingredient. And it would be kind of, it'd be quite odd, I think, if it was a different inquiry, because after all, we're trying to determine whether it goes in the drug process or whether it goes in the biological product process. And if the answer you get differs depending on where you start, that just doesn't work. So we are looking generally for what is the active ingredient. The agency has applied that consistently. The regulation clearly distinguishes between usage forms, formulation properties, versus what is actually having the pharmacological effect. Your Honor also asked about the second sentence and the regulation involving a chemical change. What we think that that addresses is a situation the courts, FDA and the courts have dealt with cases involving prodrugs, where you have something that actually does metabolize into something different in the body. That's the active Elizabeth case from this court in 2010. And Ibsen relied on that below and has not relied upon it here because Judge Friedrich, this is at Joint Appendix page 169, footnote 13, explained why that decision is not relevant here, because the lamnitide acetate is in the drug product all along. There's not a conversion where it changes into something different. And so that aspect of the regulation, we just don't think is relevant. On the analogous product, unless the court has any other questions about the protein issue, we agree with the government that ultimately all the court needs to decide here is, yes, analogous isn't going to mean the same thing. We think that's common ground, but it needs to share critical characteristics. I think it also ought to be common ground as to what it means to be analogous. And FDA has identified size as being a critical characteristic to determine whether something functioning is being like a protein. They've identified a bright line in the 40 amino acids. And as Judge Friedrich indicated, this one's not even close, because this is only an 8-peptide chain that is far below what could ever be considered a protein or like a protein. There's a reference, I believe at 271 of Joint Appendix, where the agency indicates this often gray area. But don't we have somewhat of a problem if we conclude that to the extent that the FDA, when it ruled in this case, that something can't be analogous to a protein if it has less than 40 amino acids? It just can't be. It's just categorically can't be analogous. You seem to be saying, well, okay, I'm not defending that, but size is a relevant characteristic. And so 8 isn't even close to 40, so we can say that that's a reasonable interpretation of the regulation. If it were 39, Ibsen might have a case, but it's only 8. But all of that may be true, but that's not the way that the agency performed its analysis. So isn't that a jittery problem? So to be clear, I think the agency applied the 40 line, and that line was reasonable, and that provides a sufficient basis to affirm. I was noting that, as Judge Friedrich did, this case is not close. But ultimately, whether you're determining it as a protein or analogous, if the agency is allowed to decide that size matters because that is relevant to determining complexity, there's going to be a line drawing problem. It is sensible that the agency would draw the same line for protein and analogous when it's dealing with the size feature. I agree analogous needs to sweep more broadly than protein as a category, and we think the mixture example shows that it does. But when dealing with size in particular, it would be very odd if the agency were required to say 40 is a protein and 30 is analogous to a protein. I mean, it's really the same inquiry that size is a fundamental characteristic of whether something is a protein or analogous to it. So what are characteristics that make something analogous other than the kind of three characteristics that defines whether something is a protein? So we agree with the government's characterization. The agency has provided clear rules of exclusion. It can't be analogous to a protein that lacks these fundamental characteristics, one of which is size. It seems to have treated the analogous product category as a small residual category that is going to be able to sweep in things that are not clearly contemplated in or out of the rule. And we think the mixture example certainly fits that. And the argument that a mixture that contains a protein is actually just a protein, we don't think that can be right, because as everyone here agrees, if you're looking at the active ingredient, okay, well, the way the FDA interprets active ingredient in a mixture context, it looks at the overall product. So it makes no more sense to say, well, it's really a protein when you have a mixture of a protein and a lipid, and to say, actually, it's really a lipid. It doesn't fit cleanly into the category. The agency has said in the memorandum, and this is addressed in the Teva decision, there's some discussion of the memorandum actually outlining the mixture example. If you have a mixture that is primarily composed of protein components, that's a protein. The agency acknowledges that. But what the analogous product mixture is designed to encompass is you have a situation where the protein is contributing to the therapeutic effects. It's necessary for it, but it might only be a small part of it. There are other necessary components. It could be that there's a much greater concentration of lipids in this mixture than protein. So it wouldn't make sense to say, because it contains as one component out of others, it's a protein. The agency has concluded it's analogous to one. We concluded that this mixture category was a null set. Would that be a problem for the agency's interpretation? Included as a null set. Right, that there was nothing, in fact, that was analogous to a protein that wasn't a protein standing out. Well, I guess your court suggested the null set would be a problem. As my colleague from the government indicated, it's clearly not a null set. The agency has identified products that fit within this category and has transitioned them as a result. In terms of whether it would be as a statutory interpretation matter, it would be a problem. I think everyone agrees that analogous product modifies as a grammatical matter all the enumerated categories on the list, including protein. So it needs to be analytically possible that there would be an empirical matter. There would be something that fits into that category or how many there would be. I don't think the statute speaks to that. And that's how I understood Judge Friedrich's point on that category. But the fact that you don't identify a substantial number or even any example, that doesn't mean that this is a superfluous term. Is this a fair summary of your position, which is when you look at the definition, any essential element of the definition will be a critical characteristic for purposes of this analogous assessment. And therefore, what's swept in by analogous is just things as to which the definition is silent or ambiguous. I think that's essentially right. I mean, the definition doesn't have that many criteria. It's not a list of a dozen things that it needs to satisfy. It needs to be an alpha amino acid. It needs to be a chain of at least 40 amino acids. And it needs to be a specific defined sequence. It needs to be those three things. We think Ibsen's argument that the Teva case supports them is clearly incorrect. It was just one of the two or one of the three criteria that were at issue there. But yes, I think that's essentially right. Which solves your surplusage problem. It's just an odd, very odd way of saying construe the term protein to include cases of ambiguity. Well, the analogous product category does modify each of these terms. It's been in the statute since 1902. And Ibsen, I think this is at page 400 of the joint appendix, it's acknowledged that there's not going to be a clear way to apply analogous across each category. It's going to be something that depends case by case. It's a scientific judgment. Maybe there's a square peg, round hole problem when Congress just sticks protein into the list long after analogous was already there. Well, we think that it creates a situation where the agency has to reasonably interpret how to apply it. It understands analogous. It's going to share certain fundamental characteristics, but not be coterminous with how it hashes that out. It's something that it can do on a case by case basis, and that it has done reasonably here. If the court has no other questions on the merits, I did just want to note that we had an objection on remedy to Ibsen's argument that even if, for example, a court were to conclude that the agency hadn't adequately explained what an analogous product is, that by no way would justify an order removing our client's product from the market. Status quo is that Ibsen's product is regulated as a drug. If there is a court order finding FDA's reasoning inadequate, okay, then that decision would be vacated and the agency would have to determine, based on the court's reasoning, what the right analysis is, but it wouldn't automatically convert Ibsen's product to being a biologic. It wouldn't preclude the FDA's determination that InVigin's product is safe and effective and should be able to stand the market. It would be quite disruptive to order the removal of an for a number of years. It's an extended-release product from the market. We don't think that issue is actually presented here, both because the court should affirm and because the district court didn't reach remedy and we didn't take Ibsen's reply brief to dispute the notion that if there is a question about remedy, that should be addressed on remand, but we did want to make sure the court was aware of that issue. Thank you. Thank you. All right. Ms. Stetson, you were out of time, but we'll give you three minutes. Thank you, Your Honors. Just a couple of quick points. The first is the product that was submitted to FDA, that was reviewed, that was approved, and that InVigin used as its reference product is a product with lamreatide acetate in complex nanotube structures. Now that, of course, we're talking about a transition from a drug product to a biological product, all of a sudden the lamreatide acetate in those complex nanotube structures doesn't matter. What matters is the 8-chain octopeptide. That is not consistent with the way that FDA, as Judge Wilkins, you asked counsel for the government, that is not consistent with the way that FDA reviews, approves drug products or biological products, and it's not consistent with the way in which those products are used as reference products. The second is, FDA counsel, in response to your question, Judge Katsas, said FDA does not understand analogous to be close to a protein, but not quite. That, I think, is the exact problem. What FDA's counsel then went on to say is, if something that contains a protein, that where the protein is necessary for functioning of the product and specifically contributes to the functioning of the product, that can be a protein that's in a mixture. But as we say at page 18 of our reply brief, what FDA has said before, and this is the Amarin case that we cite there, a mixture is treated as a single active ingredient. So a mixture containing a protein is a protein. The third thing I want to say has to do with the Teva case, because I take a little bit of issue with the idea that we're not accurately reciting what was said there. What FDA said in Teva, and you can find this at PIMS site 113, is that the critical component of a protein is the specific defined sequence. FDA's description was seconded by the district court at page 115 as the touchstone of a protein being specific defined sequence. And here's what the district court said. Under FDA's construction, I'm quoting, it's simply restricted to products that, although they may not satisfy the criteria to be a protein in other respects, have the characteristic specific defined sequence of amino acids. The specific defined sequence, of course, clearly exists here. Now that it does, FDA's critical touchstone component becomes something different. This structure in the final product of lanreotide acetate is a protein. Lanreotide acetate in somatolamine depot should be treated as a biological product, and the remedy should be, of course, that it should be transferred over to the biological product category. Do you think the statutory structure which distinguishes proteins from things analogous to proteins forecloses FDA from using a bright line regulatory definition as opposed to a fact and circumstances, and maybe it's 40, but not quite, so we'll give you 38, and everything just devolves into case-by-case assessments? I think for purposes of defining protein, FDA could and did permissibly decide that it was going to try to create some bright line rules. I do think, to your point, Judge Katz says earlier, the idea that something has to be analogous to a protein, and it can't be an offset, does muddy the waters a little bit. Then the question is, what's the baseline that's required? FDA has already said what the baseline is. It has to be, at least, the critical thing is a specific defined sequence of amino acids, and here what we would suggest is when you're looking at this product, the product that was reviewed, submitted, approved, and referenced, and you have a specific defined sequence of amino acids that is a complex structure of many, many peptides put together, that thing is a protein. That's analogous to the protein, at the very least. Thank you. No further questions. Thank you, Raj.
judges: Wilkins, Katsas, Rao